UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

UNITED STATES OF AMERICA            :

   - against -                                 :

MAXIMILIANO DAVILA-PEREZ,           :         Ind. S9 19 Cr. 91 (DLC)

                 Defendant.              :

------------------------------------------------------------ x

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT DAVILA'S PRETRIAL MOTIONS

<u>Preliminary Statement</u>

On December 13, 2024, defendant Maximiliano Davila-Perez ("Davila") was assigned counsel and arraigned on the instant indictment. On May 30, 2025, the previous counsel was relieved and new counsel assigned. The Court ordered that any pretrial motions be submitted by August 1, 2025. This Memorandum of Law, and all accompanying documents in support of defendant's pretrial motions, are respectfully submitted according to the Court's order.

<u>Statement of Relevant Facts</u>

On September 22, 2020, the government charged defendant Maximiliano Davila-Perez ("Davila"), a Bolivian national who had never set foot on American soil, with two counts of conspiracy: in Count One, from July 2019 up to and including September 2020, Davila is accused of conspiring to import five kilograms or more of cocaine into the United States, in violation of 21 U.S.C. § 952(a) (importing a narcotic drug), 21 U.S.C. § 960(a)(1) (importing or exporting a controlled substance) and 21 U.S.C. § 959(d) (manufacture and distribution of a controlled substance); in Count Two, from July 2019 up to and including September 2020, Davila is accused of conspiring to use and/or carry machine guns in furtherance of the charged

narcotics conspiracy, in violation of 18 U.S.C. 924(c). The indictment, identified as S9 19 Cr. 91 (DLC), was filed under seal. At the time the indictment was filed, Davila was working in Cochabamba, Bolivia as a departmental commander.[1]

The two conspiracy counts in the indictment are almost wholly based on four surreptitiously recorded conversations[2] with Davila by two confidential sources working for the government ("CS-1" and "CS-2"). No other communications with Davila exist. This is because <u>both CS's deliberately deleted WhatsApp communications between themselves and "target subjects of this investigation"</u> in violation of the government's explicit directives. *See* Report of Investigation dated November 29, 2021 (USAO_000536-538), attached as Exhibit A. The reason for the intentional and deliberate deletion of messages, according to CS-1, was that "Davila had grown suspicious of CS-1 and CS-2. CS-1 … had security concerns that Davila would confiscate their phones during the meeting and any potential drug communications and/or pictures could be used against CS-1." *Id*. CS-2 was also debriefed and reiterated the same concerns, stating that CS-1 "strongly encouraged" CS-2 to delete the WhatsApp communications. When "asked if he/she had ever been instructed by SA Kirk to never, under any circumstances, delete communications between him/herself with targets of the investigation," each confidential source answered "Yes." *Id*.

---

[1] Davila attended the Bolivian police academy in 1986. He worked as a police officer and later was appointed to work in intelligence and internal security, becoming a Colonel in 2017. On February 7, 2019, during the presidency of Evo Morales, he was appointed by Commander General Romulo Delgado to be the director of FELCN, Bolivia's chief anti-narcotics law enforcement agency. However, after the disputed election results of October 2019 resulted in the ousting of Morales in November 2019, Davila was let go along with hundreds of top officials of the Morales administration. He spent the rest of 2019 working under the new general commander, Vladimir "Yuri" Calderon. When Luis Arce Catacora assumed the presidency of Bolivia, Davila was appointed to the departmental commander post in Cochabamba. *See* El Deber, "Who is Maximiliano Davila? Evo Morales' former anti-drug chief is now wanted by the DEA," by Ariel Melgar Cabrera, 1/23/2022, http://eldeber.com.bo/pais/quien-es-masimiliano-davila-el-exjefe-antidrogas-de-evo-que-ahora-es-requerido-por-la-dea_264681/

[2] The conversations were recorded on July 27, 2019, November 21, 2019, December 14, 2019, and February 17, 2020.

No cocaine entered United States territory or waters up to 12 miles from the coast as a result of any conversations with or actions by Davila. No weapons are alleged to have been utilized – and certainly not utilized within the United States – because of any conversations with or actions by Davila. No money was ever paid to Davila. During the recorded conversations between Davila and CS-1, when explicitly asked how much he wanted to be paid, Davila refused to give a number and never asked for payment.

On January 22, 2022, while the instant indictment was still under seal, Davila was arrested by Bolivian authorities. The impetus for Davila's seizure was the sealed indictment, along with the actions of the Drug Enforcement Administration ("DEA"). This is explicitly stated in the Bolivian "Resolution of Indictment" dated January 23, 2022:

> **III. FACTUAL RECOUNT OF THE EVENTS DENOUNCED**
>
> According to background [information], the office of the DEA would have carried out arrests of Bolivian citizens in Latin American countries places where people have been identified who would be linked to the movement of transferences of monetary amounts of patrimonial assets of apparently illicit origin, for weapons trafficking and drug trafficking and particularly the former Director of the Special Force for the fight Against Drug Trafficking [FELCN], MAXIMILIANO DAVILA PEREZ and further by means of information and communication technology, IGNACIO ANGUS NIETO and OMAR ROJAS ECHEVERRIA have been identified.
> The Public Ministry, through videos and publications that circulate in the national digital media, as well as in social media, became aware of alleged criminal acts. On the date of January 18, 2022, according to the journalist's note published in the webpage of the digital newspaper El Deber [Duty] with URL: https://eldeber.com.bo/edicion-impresa/la-dea-registro-a-ex-jefes-antidroga-de-evo-vinculados-a-omar-rojas 263980#. … it is held that in previous interactions acts of corruption would have happened which involve the former Director in events that go against the law, and that he himself is the subject of case in the United States.
> …
> **VI. LEGAL GROUNDS AND TEMPORARY ASSESSMENT OF THE EVENTS**
>
> **FIRST**.-Given that, according to what the press entity PAGINA SIETE indicates, "On March 9, 2021, in the international operation "Andes," directed

> by DEA, former Major of the Bolivian Police, Omar Rojas Echevarria, was captured. …
>
> **SECOND**.-Given that, according to the accusing document to request the extradition of Rojas … lodged before the Superior Court of Justice in Colombia, appears the name of Colonel Maximiliano Davila Perez a/k/a "Macho."
>
> …
>
> **FOURTH**.-Given that **the document from U.S. Justice details the "sealed indictment against Maximiliano Davila Perez aka 'Macho' …" …it is expected that several subjects of the investigation will be taken to the Southern District of New York to be tried for international drug trafficking.**

*See* translated Resolution of Indictment,[3] attached as Exhibit B, at pp. 2-3. (Emphasis added.)

Bolivia and the United States are parties to an Extradition Treaty, signed at La Paz, Bolivia on June 27, 1995, and ratified by the United States Senate on August 2, 1996. *See* Congress.gov, 104th Congress (1995-1996), Treaty Document 104-22. The Treaty identifies the circumstances under which extradition may be obtained, and outlines the procedure in Article VI. *See* Treaty of Extradition between Bolivia and the United States, attached as Exhibit C. Requests for extradition are to be made in writing and "submitted with supporting documentation through the diplomatic channel." The supporting documentation is to include "the most precise physical description possible of the person sought and any known information regarding … the person's location." It must also include, *inter alia*, a description of the charges, a certified copy of the charging instrument, and a certified warrant of arrest. *See* Exhibit C, Article VI (2) and (3).

The Treaty also provides, "in cases of urgency," for the provisional arrest of the person sought. To this end, the Treaty requires the "Requesting State" to provide a description and identification of the person sought and his whereabouts. Exhibit C, Article VIII. While not explicitly stated, the Article implies that "cases of urgency" are those cases where it is feared the defendant will flee.

---

[3] The original Spanish language version, that is the basis of the translation, is also appended behind the English version.

Davila, however, was already in custody at the time the instant indictment was unsealed. On February 1, 2022, ten days after Davila was arrested in Bolivia, the government requested that this Court unseal the indictment because "the defendant was recently detained in Bolivia and we are seeking Davila's extradition to the United States." *See* DKT 141, so ordered by this Court on 2/1/22. However, despite this representation in its letter, the government did not in fact seek extradition at that time. From February 1, 2022 until October 1, 2024, the government inexplicably chose not to request extradition of Davila.

The government instead requested provisional arrest despite Davila's custodial status in Bolivia. *See* translated excerpt of Bolivian Supreme [Extradition] Order No. 337/2024 at p.2 (Spanish version stamped USAO_000123A), attached as Exhibit D:

> [T]his High Court is also transmitting Verbal Notes Nos. 28/2022 of February 1; 111/2022 of April 28; and 014/2023 of January 13, by which the United States requested from the Plurinational State of Bolivia "Preventive Detention for Extradition Purposes" of the Bolivian citizen Maximiliano Davila Perez, filed by the United States District Court for the Southern District of New York in Case No. S9 19 Cr. 91 (DLC) for the crimes of Illicit Drug Trafficking and Firearms Related Offenses.

*See also* X Post of the Bolivian Foreign Ministry (@MRE_Bolivia), dated February 2, 2022, attached as Exhibit E.

On February 2, 2022, the day after this Court ordered the indictment unsealed, the government published and disseminated what appears to be a "wanted" poster, offering **five million dollars** ($5,000,000) to any individual who can provide evidence that would lead to the conviction of Davila in an American court:[4]

---

[4] This extraordinary reward amount may in and of itself violate due process. Such an amount would entice false testimony, and is tantamount to a payment for false testimony.

5



*See* the official Department of State release at https://www.state.gov/maximiliano-davila-perez/.

The January 23, 2022 Bolivian Resolution of Indictment against Davila ends with a request that Davila be ordered into "Preventive Detention in the San Pedro Penal Facility for a Period of 6 Months." Exhibit B at p. 10.

However, after the six month period, Davila was never released. In an application for habeas relief dated October 24, 2022, more than six months after he was placed in preventive detention, defense attorneys Uriarte and Figueroa argued that "cessation of preventive detention" was required because the six months had passed without the Public Ministry asking to expand the period of incarceration, and the *Fiscal de Materia* (the "Investigating Prosecutor") had not requested to extend the period of detention. That relief was denied. *See* translated summary of File #51555-2022-104-AL, attached as Exhibit F.

During the nearly three years that Davila was detained in Bolivia, no Bolivian trial was held. The United States finally made a formal request for extradition on October 1, 2024. Bolivia approved Davila's extradition on November 27, 2024.

<u>Argument</u>

I.

**THE INDICTMENT MUST BE DISMISSED BECAUSE
THE GOVERNMENT'S PROLONGED AND DELIBERATE
DELAY IN SEEKING EXTRADITION VIOLATED
DAVILA'S CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL**

In the instant case, the facts regarding delay are undisputed: (1) Davila was indicted on September 22, 2020; (2) at the time he was indicted, he was the departmental commander of Cochabamba in Bolivia, under his own name with a known location; (3) Davila was arrested sixteen months later on January 22, 2022 by Bolivian authorities based explicitly on the instant indictment; (4) the government immediately asserted an interest in extraditing Davila to the United States in its letter to this Court on February 1, 2022; and (5) the government failed to request extradition of the defendant until October 1, 2024.

The total delay from the date the indictment was first voted is four years. The delay from the time that the indictment was unsealed to seek Davila's extradition is two years and eight months. Davila arrived in the United States on December 13, 2024, so an additional two months and two weeks is chargeable to the government. This post-indictment delay is placed squarely at the feet of the government.[5] None of it was caused by Davila. The government's prolonged and deliberate delay violates Davila's constitutional right to a speedy trial.

The Sixth Amendment provides that, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial…." In assessing whether Davila has been deprived of his right to a speedy trial, the Supreme Court has identified four factors that must be assessed: the length of the delay, the reason for the delay, the defendant's assertion of his right to a speedy

---

[5] Davila does not include the time from his arraignment and bail hearing on December 13, 2024 through this motion practice.

7

trial, and any prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). All four factors weight in Davila's favor and the case must be dismissed.

Length of the Delay. The Sixth Amendment speedy trial guarantee attaches when an indictment is filed, regardless of whether it is sealed. *See United States v. Leaver*, 358 F.Supp.2d 255 (SDNY 2004)(Scheindlin, J.), and cases cited therein. A court must first determine whether the length of the delay between accusation and trial is "presumptively prejudicial." *Barker v. Wingo*, *supra*. Here, the total length of the delay is four years, which meets the general consensus of what can be considered presumptively prejudicial. The Second Circuit has noted, without expressly so holding, that among commentators there is a "general consensus that a delay of over eight months meets this standard, while a delay of less than five months does not." *United States v. Vassell,* 970 F.2d 1162, 1164 (2d Cir.1992).  *See also United States v. Ghailani*, 733 F.3d 29, 43, n.13 (2d Cir. 2013)("As with other issues in this area of the law, the definition of 'presumptively prejudicial' remains less than precise…. *cf. Doggett,* 505 U.S. at 652 n. 1, … noting, without further comment, that lower courts generally had found delay to cross this threshold 'at least as it approaches one year')."

Reason for the Delay. "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government, rather than with the defendant." *Barker, supra* at 531.

Here, the indisputable fact is that Davila's location, working openly as a departmental commander in Cochabamba, Bolivia, was known from the inception of the charges in 2020. He was then arrested and in the custody of Bolivian authorities, as was trumpeted through the world

by the international press. Thus, there is no excuse for the government's delay in bringing Davila to the United States for trial. In its very request to this Court to unseal the indictment, the government explicitly averred that "we are seeking Davila's extradition to the United States." (DKT. 141) Yet nearly three years went by before the government finally requested extradition.

Moreover, the delay was deliberate. There were no outside obstacles or factors that would have prevented the government from promptly seeking extradition. Rather, given the "wanted" poster that went up immediately after the indictment was unsealed, offering the remarkable and unprecedented reward of five million dollars for information that would lead to the conviction of the defendant, it appears that the delay arose because the United States had little to no real evidence against Davila and needed to procure some. The government clearly knew that the sparse recordings of Davila by CS-1 and CS-2, combined with the deliberate destruction of WhatsApp messages, in violation of their duty to the government, destroyed their credibility.

"Where the Government intentionally delays in order to gain an advantage at trial, this factor weighs heavily against the Government." *United States v. Ostroff*, 340 F.Supp.2d 362, 367 (SDNY 2004)(*citing Barker v. Wingo, supra*).

The defendant's assertion of his right to a speedy trial. This motion practice, with newly assigned counsel, is the first opportunity that Davila has had to assert his right to a speedy trial.

Any prejudice to the defendant. Because of the refusal of the United States to request extradition, Davila spent nearly three years in prison without a trial, disabled from doing anything to further his defense and helplessly watching as the international press destroyed his reputation. "[I]f a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense." *Barker v. Wingo, supra* at 533. In addition, the four years' delay in bringing Davila to the United States is presumptively prejudicial. *See Doggett v.*

9

*United States*, 505 U.S. 647 (1992)(the negligent delay between indictment and arrest presumptively prejudiced defendant's ability to prepare an adequate defense).

For all of the above reasons, the indictment must be dismissed due to the government's violation of Davila's right to a speedy trial.

## II.

### TO THE EXTENT THE INDICTMENT IS BASED ON ALLEGED VIOLATIONS OF 21 U.S.C. §§ 952(A), 960(A)(1), OR 18 U.S.C. § 924, THE COURT LACKS JURISDICTION AND SO THE INDICTMENT MUST BE DISMISSED

Nowhere does the indictment allege that any of the acts with which Davila is charged occurred within the territorial United States. To the contrary, both counts of the indictment explicitly allege that the offenses contained therein occurred outside this country. Neither 21 U.S.C. § 952(a), 21 U.S.C. § 960(a)(1), nor 18 U.S.C. § 924(c), as charged in the indictment against Davila, apply to acts committed outside of the United States. Accordingly, to the extent that the indictment is predicated on violations of 21 U.S.C. § 952(a), 21 U.S.C. § 960(a)(1), and/or 18 U.S.C. § 924(c), or on conspiracy to violate those statutes, it must be dismissed.

The Second Circuit in *United States v. Yousef, et. al*, 327 F.3d 56 (2nd Cir. 2003), stated that "there is a presumption that Congress does not intend a statute to apply to conduct outside the territorial jurisdiction of the United States." However, "that presumption can be overcome when Congress <u>clearly</u> expresses its intent to do so." 327 F.3d at 86. (Emphasis added.) Here, the plain language of 21 U.S.C. §§ 952 and 960(a)(1), as well as 18 U.S.C. § 924, is irrefutable evidence that Congress had no such intent.

Thus, for example, 21 U.S.C.§ 952(a) describes the crime it prohibits as follows: "It shall be unlawful to import into the customs territory of the United States from any place outside

thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I, or any narcotic drug in schedule III, IV, or V of subchapter I, or ephedrine, pseudoephedrine, or phenylpropanolamine."[6] Obviously, on its face, under this text, a violation of 21 U.S.C. § 952 only occurs when the forbidden substance crosses the threshold of the border of the United States. This precludes a Congressional intent to make § 952 applicable to acts which occur outside the territorial United States.

>Similarly, 21 U.S.C. § 960(a)(1) reads:

>**(a) Unlawful acts**
>Any person who--
>**(1)** contrary to section 825, 952, 953, or 957 of this title, knowingly or intentionally imports or exports a controlled substance,

Like the text of § 952, on its face the text of § 960(a)(1) applies only to acts that occur inside the territorial United States. There is nothing in this language that even remotely suggests that it should apply to acts of import or export occurring outside of this country, e.g., from Bolivia to Peru, or from Bolivia to the Dominican Republic.

Contrast the clear lack of Congressional intent above with the explicit language of 21 U.S.C. § 959(d):

>**(d) Acts committed outside territorial jurisdiction of United States**

>>This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States.

---

[6] Subsection (b) of § 952, which prohibits the importation of certain non-narcotic substances, reads substantially the same: "It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any nonnarcotic controlled substance in schedule III, IV, or V."

The above language illustrates that when Congress specifically intends that a criminal statute regulating controlled substances should apply to acts occurring outside of the territorial United States, it does not hesitate to do so in explicit terms. In sharp contrast, neither 21 U.S.C. § 952, nor 21 U.S.C. § 960(a)(1) contain such an explicit authorization for application outside the United States, even though they are set forth in the same Title (21), the same chapter (13), and the same subchapter (II), in which § 959 occurs.

The fact that § 959 has a specific section applying it to acts outside the United States, but that § 952 and § 960(a)(1) do not, is strong evidence that Congress did not intend for these two sections to acts in a foreign country. There is literally nothing in the substantive text of either of these statutes that suggests, even inferentially, that Congress meant for them to apply outside the United States.

The statute, 18 U.S.C. § 924, likewise contains no such authorization. There is nothing in the text of § 924(c) that suggests that it applies outside of the United States:

> **(c)(1)(A)** Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--

Once again, there is absolutely nothing in the substantive language of this statute that suggests that it applies to acts committed in a foreign country.

Finally, the fact that both counts of the indictment allege conspiracies to violate these statutes, rather than substantive and direct violations of them, makes no difference. The first element of a criminal conspiracy under Federal law is "(1) an agreement among two or more

12

persons, the object of which is an offense against the United States." *United States v. Svoboda*, 347 F. 3d 471,476 (2nd Circuit 2003).

Since Congress did not intend that 21 U.S.C. § 952(a), 21 U.S.C. § 960(a)(1), and 18 U.S.C. § 924(c) should have application to acts committed outside the United States, it follows that such a conspiracy could not have as its object an offense against the United States. Accordingly, to the extent that the conspiracies set forth in the indictment have as their object the violation of these three statutes occurring in a foreign country, they do not state an offense against the United States, and must be dismissed.

### III.

### THE DELIBERATE DESTRUCTION OF TEXT MESSAGES VIA WHATSAPP BY THE CONFIDENTIAL SOURCES ALSO MANDATES DISMISSAL OF THE INDICTMENT

According to the Report of Investigation attached as Exhibit A, CS-1 and CS-2 deleted their WhatsApp messages with "targets of the investigation" sometime before an anticipated meeting with Davila in February 2021 – a meeting which never happened. The sources had "security concerns" that the messaging of "any potential drug communications and/or pictures" could be used against them by Davila – clearly indicating a belief that Davila (at that time a departmental commander in Cochabamba) would arrest and prosecute them. The belief that Davila would confiscate their phones and use the messages against them also strongly implies that, as to Davila, the messages were exculpatory and may possibly constitute Brady material. *Brady v. Maryland,* 373 U.S. 83 (1963). Even if the deleted WhatsApp messages cannot be proven to be Brady material, they would certainly have constituted valuable impeachment material for the testifying CS's.

13

This is not idle speculation. In the recorded conversations, Davila never commits to any specific action. In the July 27, 2019 recording, for example, one of the confidential sources is telling Davila that he met with people who want to put "1200" in Punta Cana (in the Dominican Republic). Davila says "When they give you permission, let me know…." A short time later the CS directly asks Davila how much money he wants for the job, and Davila responds "Well, you figure out how much they pay." The next recorded conversation is four months later on November 21, 2019. This is the day that, because of the election irregularities and overthrow of the Evo Morales administration, Davila is removed from his job as the head of FELCN and hence no longer has any power to control anything. *See* FN 1, at p. 2, *supra*. No money was ever asked for by nor given to Davila for any supposed operation.

The deleted WhatsApp messages could certainly have demonstrated the sheer lack of involvement of Davila in the planned schemes to deliver drugs to various countries, as well as the concerns that the active participants have about Davila's position in law enforcement. Many of the recordings by the confidential sources are not with Davila, but rather persons talking about Davila. Indeed, one conversation on October 18, 2019 between one of the CS's and Jheyson Montano-Fernandez highlights that they are "worried" because "the law is in the middle" and now "the law" knows who is involved. By "the law" it appears the participants are worried about Davila. Montano says that they wouldn't want law enforcement to know exactly where the product is. In response, the CS says that he understands why there is distrust now that Davila is involved. *See* summary translation of 10/18/2019 conversation, USAO_00272-276, attached as Exhibit G.

The Supreme Court has held that, unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of

due process of law. *Arizona v. Youngblood*, 488 U.S. 51 (1988). "A criminal defendant is entitled to relief based on the government's pre-trial destruction of (or failure to preserve) potentially exculpatory evidence where: '(1) the government ... acted in bad faith in destroying the evidence; (2) the evidence ... possess[ed] an exculpatory value that was apparent before it was destroyed; and (3) the defendant [was] unable to obtain comparable evidence by other reasonably available means.'" *United States v. Hunley*, 476 Fed.Appx. 897, 898-99 (2d Cir. 2012), *quoting United States v. Tyree*, 279 Fed.Appx. 31, 33 (2d Cir.2008).

      Here, the confidential sources employed by the government, and utilized over a period of years virtually to the complete exclusion of other types of investigation, openly defied the instructions given to them by Special Agent Jeremy Kirk to "never, under any circumstances, delete communications between him/herself with targets of the investigation." Exhibit A at p. 2. This willful disregard of explicit instructions is bad faith that must be attributable to the government, since the government elected to use these confidential sources and relied on their assumed integrity, which turned out to be non-existent. This is no "bureaucratic error," as in *Youngblood, supra*.

      "[T]he government acts in bad faith when the record shows that evidence was 'intentionally destroyed.' *United States v. Steele*, 390 F. App'x 6, 9 (2d Cir. 2010); *see also United States v. Ungar*, 648 F. Supp. 1329, 1336 (E.D.N.Y. 1986)('Sanctions will normally follow when destruction is deliberate.')." *United States v. Soriano*, 401 F. Supp. 3d 396, 401 (EDNY 2019). Because there is no doubt these communications were intentionally destroyed, sanctions must be imposed. Since virtually the entire accusation against Davila is based on the actions of these cooperating sources, dismissal is the appropriate sanction.

The text messages possessed potential exculpatory value for the defense. They were comprised of statements of the confidential sources themselves, both of whom could be impeached with their prior text message statements.[7] "The credibility of the cooperating witness and his interpretation of what was transpiring and being said at the meetings with the defendants herein is of paramount importance, and the text messages would have enabled the defense to conduct a more effective and thorough cross examination…." *United States v. Suarez*, 2010 WL 4226524 (DNJ 2010).

Finally, there is no possible way in which Davila could obtain "other comparable evidence by other reasonably available means." *Hunley, supra*. When he was arrested by Bolivian authorities on January 22, 2022, more than three and a half years ago, he was divested of all personal possessions and has been kept incarcerated ever since, first in Bolivia and now here in the United States.

Because of the bad faith of the confidential sources, for whose conduct the government was directly responsible during this years-long investigation, the indictment must be dismissed.

## Conclusion

For all of the above reasons, the defendant respectfully requests that the within motions be granted, and for such other and further relief as to this Court seems just and proper.

Respectfully submitted,

*Camille M. Abate*

CAMILLE M. ABATE

---

[7] The Jencks Act and Federal Rule of Criminal Procedure 26.2 require the Government to disclose prior recorded statements of its witnesses. 18 U.S.C. § 3500(b); Fed.R.Crim.P. 26.2. The purpose of the Jencks Act and Rule 26.2 is to permit defense counsel to have the materials necessary to impeach a Government witness. *United States v. Rosa*, 891 F.2d 1074, 1076–77 (3d Cir.1989) (*citing Jencks v. United States*, 353 U.S. 657, 667, 77 (1957)).