

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 17, 2026

**<u>Via ECF</u>**

Honorable Denise L. Cote
United States District Judge for the
Southern District of New York
500 Pearl Street
New York, NY 10007

      **Re:**    ***United States v. Maximiliano Davila Perez*, S9 19 Cr. 91 (DLC)**

Dear Judge Cote:

      The Government respectfully submits this letter in advance of the March 19, 2026 sentencing in this matter, following the defendant's conviction at trial in October 2025 of conspiring to (i) import cocaine into the United States and (ii) use and possess machineguns in furtherance of that drug trafficking conspiracy.

      The evidence at trial established that, between approximately February 2019 and November 2019, while the defendant served as the Director of Bolivia's most important anti-narcotics law enforcement agency, *Fuerza Especial de Lucha Contra el Narcotráfico* ("FELCN"), the defendant exploited his office and his powerful political and law enforcement connections to facilitate massive, international-scale cocaine trafficking. The defendant's methods included both diverting law enforcement from investigating favored cocaine traffickers and providing heavily armed FELCN personnel as security for cocaine shipments leaving Bolivian airports. The trial evidence—including surreptitiously recorded calls and meetings—proved that the defendant conspired with others to manufacture, ship, and provide armed protection for more than one metric ton of cocaine destined for the United States. Put simply, instead of using his lifelong experience in law enforcement and his powerful position to be a force for good in Bolivia, the defendant conspired with drug traffickers to send massive amounts of cocaine to the United States.

      The defendant's abuse of power and the jaw-dropping quantities of cocaine he conspired to import to the United States while in Bolivia alone merit significant punishment. But the defendant's complete disregard for the rule of law did not stop after he was extradited to the United States. During the defendant's trial, the Government offered, among other things, recordings between and among the defendant and his co-conspirators; the testimony of multiple witnesses, including witnesses aware of the defendant's history of corruption, who interacted with the defendant and his co-conspirators during and in connection with the charged conspiracy; and 10 kilograms of cocaine obtained from the defendant's co-conspirators in Peru. In addition, despite the fact that the defendant had previously met with the Government and admitted his guilt, the defendant subsequently chose to take the stand, and, despite swearing to tell the truth, repeatedly

and demonstrably lied during his testimony.  The defendant testified he was conducting, in his official capacity as the head of FELCN, an undercover operation targeting his co-conspirators for arrest and prosecution in Bolivia, and therefore never agreed to import cocaine to the United States. Attempting to explain his prior admissions to the Government, the defendant compounded his perjury by accusing his prior defense counsel of coaching the defendant to lie in an effort to manufacture cooperation credit.[1]  The jury flatly rejected the defendant's incredible attempts to explain away his guilt.  Finally, in his sentencing submission, the defendant has effectively maintained his own self-serving and perjurious testimony and continues to deny responsibility for the offense conduct.

The defendant's brazen offense conduct, shocking abuse of power, and continued attempts to subvert the administration of justice demand a Guidelines sentence of life imprisonment.  As set forth below, nothing in the defendant's sentencing submission or in the U.S. Probation Department's final presentence investigation report ("PSR") justifies a downward variance; to the contrary, the defendant's continued attempts to lie to the Court and blame everyone but himself for his commitment to large-scale narco-corruption are aggravating factors that further justify a Guidelines sentence.  Accordingly, and in view of the applicable Section 3553(a) factors described below, the Government respectfully submits that a Guidelines sentence of life imprisonment is warranted and is sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.

## BACKGROUND

### I.  The Offense Conduct[2]

#### A.  Background on Bolivia and the Defendant

In 2006, Evo Morales—a former coca farmer and coca union leader—became Bolivia's president.  Two years later, in 2008, Morales expelled the U.S. Drug Enforcement Administration ("DEA") and the U.S. Department of State ("State Department") from Bolivia due to tensions relating to, among other things, U.S. anti-narcotics policies in the region.  In the years that followed, cocaine traffickers in Bolivia acted with impunity, increasing cocaine production in-

---

[1] The defendant has moved to seal the portions of his sentencing submission that refer to his proffer statements and the purported advice by prior counsel to lie to the Government during those proffers.  There is no basis for sealing, as the Court has unsealed briefing concerning the defendant's proffer statements, (*see* Dkt. 504), and the defendant testified in open court about these claims, including that his former counsel instructed him to lie to the Government, (*see* Tr. 910:21-911:6, 912:20-22, 923:3-9, 923:20-924:1). Moreover, the defendant has previewed that he intends to bring a habeas claim following sentencing and while an appeal is pending.  (Def. Mem. at 2 n.1).  To the extent the defendant plans on doing so in support of a claim for ineffective assistance of counsel, which would be meritless, the Court previously ordered the defendant to file any such claim prior to sentencing.

[2] Unless otherwise indicated, the facts set forth below are as described in the PSR or the evidence introduced at the defendant's trial.

country and serving as a key transit point for the international distribution of cocaine to various countries around the world, including the United States.

In November 2019, following Morales's attempt to run for a fourth consecutive presidential term, there was widespread civil unrest in Bolivia, ultimately resulting in Morales's removal. In the years that followed, certain corrupt members of the Bolivian government and its national anti-narcotics force, FELCN, continued to serve as key facilitators for the production and export of cocaine from Bolivia. Indeed, in 2019, the State Department identified Bolivia as the third-largest producer of cocaine in the world.

The defendant was one of the corrupt government officials responsible for facilitating state-sponsored cocaine trafficking in Bolivia. The defendant had been a law enforcement officer in Bolivia since approximately 1986. In approximately 2017, the defendant began to work in a Bolivian intelligence unit, ultimately being appointed as the Director of Intelligence in Bolivia. Thereafter, in approximately February 2019, the defendant was appointed by Morales to be the Director of FELCN. The defendant maintained close ties to Morales and those in his administration during his time as Director of FELCN. A photograph of the defendant, wearing a camouflage military uniform, standing next to Morales and in front of birthday cakes adorned with coca leaves, is below:



As set forth below, in his role as Director of FELCN, the defendant utilized his leadership position and powerful connections in furtherance of his cocaine trafficking, including to divert law enforcement resources away from investigating traffickers aligned with the defendant, and by ensuring that armed FELCN officers provided security for cocaine shipments leaving Bolivian airports. The defendant did so during recorded meetings and calls with his co-conspirators and DEA confidential sources (the "CSes") between approximately 2019 and 2020. Those meetings and calls resulted in the arrangement of a 10-kilogram sample of cocaine, authorized by the defendant, to be provided to the CSes in Lima, Peru, in December 2019. Throughout the conspiracy, the defendant repeatedly emphasized his willingness to participate in and provide protection for a shipment of over one ton of cocaine leaving Bolivia and transiting through the Dominican Republic before ultimately reaching the United States.

**B.   February 2019: The Defendant Becomes Director of FELCN and Immediately Abuses His Position to Help Drug Traffickers**

In late 2018, the defendant was serving as the Director of National Intelligence in Bolivia. (Tr. 108:24-109:15).  During that time, the defendant contacted his former classmate from the Bolivian National Police Academy, co-defendant Omar Rojas ("Rojas"), who testified at trial pursuant to a cooperation agreement, and requested to meet with him in the city of Santa Cruz, Bolivia.  (Tr. 89:1-10, 108:24-109:23).  The defendant came to the meeting with an agent from a special intelligence group in Bolivia who was armed with an M-4 submachine gun.  (Tr. 109:24-111:6).  In the meeting, the defendant told Rojas he expected to be appointed as the director of FELCN in a few weeks, and he recruited Rojas to provide him with information about narcotics traffickers to whom the defendant would give coverage and protection in exchange for money. (Tr. 111:14-112:19).

In approximately February 2019, the defendant was in fact appointed by the then-president of Bolivia, Evo Morales, to serve as the Director of FELCN, a role in which he led the premier anti-narcotics trafficking agency in Bolivia and was entrusted with carrying out operations against drug traffickers throughout the country.  (Tr. 89:11-90:3, 106:10-16, 113:20-23, 114:21-23).

The defendant promptly began abusing his position in FELCN to profit from his partnership with drug traffickers.  For example, Rojas testified that in early 2019, the defendant sent Rojas to retrieve $9,000 from a drug trafficker, which the trafficker described as the remainder of a payment he owed to the defendant for the defendant's provision of "coverage" to cocaine-filled airplanes as they left the Mondaca Aerodrome airport in Bolivia and flew out of the country. (Tr. 130:21-132:24).  On another occasion in March 2019, also in exchange for thousands of dollars, the defendant provided protection to Peruvian drug trafficker and co-defendant Jhon Cahuana Barrientos ("Cahuana") for an airplane of cocaine leaving Viru Viru International Airport in Bolivia destined for Spain.   (Tr. 133:18-22, 137:6-11, 138:10-142:25, 146:1-8).   Indeed, Cahuana paid a monthly fee to the defendant in exchange for the defendant's protection of Cahuana and Cahuana's drugs.  (Tr. 148:7-24, 644:24-645:5).  During this same general timeframe, the defendant accepted a $100,000 bribe from a drug trafficker to release a drug plane that had been seized by FELCN.  (Tr. 146:9-147:16; *see* GX 202-T).

**C.   July 2019: The Defendant Agrees to Provide Armed Protection for a 1,200 Kilogram Cocaine Shipment to the United States**

In July 2019, a DEA confidential source ("Ignacio") posing as a broker for a Dominican Republic-based network seeking to ship approximately 1,200 kilograms of cocaine from Bolivia to the Dominican Republic and then to New York, first discussed a potential cocaine deal with Rojas, a retired Bolivian law enforcement officer who had a close relationship with the defendant. (PSR ¶ 25).  During a meeting in Bolivia on July 25, 2019, Rojas and Ignacio discussed the logistics involved in sending the load from Bolivia to the Dominican Republic via a passenger airplane to which Ignacio's network had access.  (Tr. 173:14-174:20; GX 201A-T at 11-12).  Rojas and Ignacio also discussed that Cahuana, who maintained access to cocaine manufacturing laboratories in Bolivia, could provide the cocaine, and that the defendant—the then-Director of

FELCN—could secure the load's safe transport by air out of Bolivia.  (Tr. 174:21-24, 175:8-177:25; GX 201B-T at 5-7; GX 201C-T at 1-3, 29-30).

Approximately two days later, on July 27, 2019, Ignacio met with the defendant to discuss the potential deal, which, he explained, contemplated a shipment of 1,200 kilograms of cocaine leaving Bolivia by plane and, in the first instance, landing in the Dominican Republic.  (GX 202-T at 19-23, 73-74).  During the meeting, the defendant suggested certain airports where he controlled airport security and the defendant could divert law enforcement personnel to ensure the plane would successfully be loaded with cocaine.  (See GX 202-T).  Specifically, the defendant said that on the day of the cocaine shipment, he would do an operation elsewhere and "take out everyone," that is, ensure no investigative or operational FELCN personnel were available to interfere with the drug plot.  (GX 202-T at 42).  The defendant also committed to sending certain FELCN agents—who he referred to as "one or two idiots, dumbasses . . . in a 'lobo[3]'"—to guard the plane as it was loaded with cocaine.  (GX 202-T at 45-50).  The defendant told Rojas that the FELCN officers he agreed to send to protect the cocaine load would be wearing camouflage uniforms and would be armed.  (Tr. 183:7-12).  Rojas further testified that standard-issue firearms for FELCN officers are M-16 rifles, M-4 submachine guns, and nine-millimeter pistols, and that M-16s and M-4s are automatic weapons.  (Tr. 100:20-101:4).  Examples of some of the types of weapons used by FELCN officers are below:



---

[3] Rojas testified that lobos are SUVs that FELCN uses in Bolivia to carry out operations, meaning the defendant proposed corruptly using law enforcement personnel in official vehicles to cover up and provide security for the cocaine conspiracy.  (Tr. 182:10-12).



During the July 27, 2019 meeting, the defendant and Ignacio further discussed the price per each kilogram shipped under the defendant's protection at the airport and the logistics of getting 1,200 kilograms of cocaine to the airport. (GX 202-T at 66-68, 78-80). The defendant assured Ignacio, "[Y]ou are also going to profit, I am going to win too." (GX 202-T at 68).

After meeting with the defendant, Rojas introduced Ignacio to Cahuana in Santa Cruz, Bolivia on July 31, 2019. (Tr. 189:1-8; *see* GX 203A-T through GX 203D-T). As described above, Cahuana already had a then-existing drug trafficking partnership with the defendant. During a recorded meeting, Ignacio, Cahuana, and Rojas discussed the plan to send cocaine from Bolivia to New York via the Dominican Republic and Mexico. (*See* GX 203A-T through GX 203D-T). The parties also discussed the defendant's role in providing security for the operation. (*Id*.). Specifically, they discussed how FELCN officers under the defendant's command would serve as protection as cocaine was loaded on the plane and that the plane would depart without issue. (GX 203A-T at 3-7). Such protection was twofold: the defendant "was going to make up a case in a certain location so that all his personnel would go to see about that false positive," and separately, the defendant "would simply leave some of his personnel in the airport so that they could guard the 1200 kilos of cocaine, and the plane could leave as planned." (Tr. 191:1-8). Rojas and Cahuana further agreed that, because the cocaine was destined for the United States rather than Europe, the price for transportation would be lower due to reduced security risks for loads transiting through Mexico. (Tr. 198:7-199:24; GX 203B-T at 14; GX 203C-T at 38-39).

### D.  October 2019: The Defendant's Co-Conspirators Demonstrate Access to a Cocaine Laboratory and Provide a Sample Kilogram of Cocaine

On October 15, 2019, Ignacio met with co-defendants Jheyson and Herland Montano-Fernandez ("J. Montano" and "H. Montano," respectively, and, together, the "Montano Brothers"), who had been sent by Cahuana, to discuss their purported cocaine laboratory in Bolivia. (*See* Tr. 665:22-671:9; GX 204A-T and GX 204B-T). During the meeting, the Montano Brothers assured Ignacio that their cocaine was between 96% and 97% pure. (GX 204A-T). J. Montano further told Ignacio during this meeting that for the shipment to succeed, police protection was necessary. (GX 204A-T and GX 204B-T). J. Montano asked Ignacio where Ignacio intended to take the

cocaine, and Ignacio explained, "all the way to the United States." (GX 204A-T at 91). Ignacio and the Montano Brothers then planned for Ignacio to visit the cocaine lab. (Tr. 668:8-15; GX 204A-T and GX 204B-T).

Rather than visiting the lab, however, Ignacio and J. Montano met again on or about October 18, 2019, when J. Montano showed Ignacio videos of the lab and the cocaine manufacturing processes that the lab used. (Tr. 676:8-687:11; GX 205A-T through GX 205D-T). J. Montano agreed to provide Ignacio a sample for his U.S. customers, stamped, at Ignacio's request, with the numbers "959." (GX 205D-T at 63-73). J. Montano also agreed to create a video showing the entire process of the production of the cocaine sample in the lab, from its inception through the embossing of the requested "959" stamp on the sample kilogram of cocaine. (*Id.*). During this meeting, Ignacio and J. Montano also discussed the defendant's role in providing security for the cocaine shipment upon its arrival at the airport in Bolivia. (GX 205A-T at 25-34). At trial, J. Montano testified, "[E]veryone—not just me, but everyone in Santa Cruz, the city of Santa Cruz—knew that Mr. Macho, Maximiliano Davila [*i.e.*, the defendant], was the person who provided coverage to drug traffickers. There was no other name or no other person in Santa Cruz who provided this sort of coverage to drug traffickers." (Tr. 680:12-18). During the October 18, 2019 meeting, J. Montano also told Ignacio that J. Montano had heard that the defendant was "scared" that the cocaine buyers "are with the DEA" "[s]ince the delivery is for the United States." (GX 205D-T at 5-17). J. Montano further testified that Cahuana told him that the defendant told Cahuana to "be very careful that the DEA should not be behind this job." (Tr. 686:12-21).

The following day, on October 19, 2019, J. Montano sent Ignacio several videos and photographs of the cocaine laboratory, including a video demonstrating the production of a sample kilogram of cocaine stamped with the requested "959" number. (Tr. 709:11-711:3). A still image from one such video, GX 318, showing the "959"-imprinted kilogram press, and the finished product of the stamped kilogram of cocaine, are below:



On October 29, 2019, J. Montano met with Ignacio and Rojas to provide the sample kilogram. (Tr. 201:5-14; GX 206A-T through GX 206C-T). During this meeting, J. Montano provided the sample kilogram to Rojas, who brought it inside an apartment where Ignacio and

Rojas tested its quality. (Tr. 201:5-204:13). Later that same day, Rojas—who had been sent by the defendant to attend meetings with the CSes and the other co-conspirators as the defendant's representative—called the defendant to inform him that they had received the sample kilogram. (Tr. 204:14-205:1).

### E. November 2019: The Defendant Once Again Agrees to Provide Protection for a Cocaine Shipment Bound for New York

On November 21, 2019, the defendant, Rojas, H. Montano, and Ignacio met in Bolivia to discuss pricing and logistics for the cocaine deal. (Tr. 209:7-17; GX 209A-T through GX 209D-T). During the meeting, the participants discussed at length a planned cocaine transaction in Peru in which additional sample kilograms would be provided to the purported cocaine buyers in exchange for payment, as well as the larger anticipated cocaine deal for which the defendant would provide protection. (GX 209A-T through GX 209D-T). The defendant was present for and actively participated in those conversations. The defendant further confirmed that he understood that the anticipated cocaine deal was for over one ton of cocaine and stated that he would assign a particular FELCN commander and his team to provide protection for the shipment once it arrived at the airport in Bolivia. (GX 209A-T at 31-36, 46-53).

In the middle of this meeting, another DEA confidential source ("Rodriguez")—posing as a high-ranking member of the Dominican network that Ignacio purportedly represented—spoke with the defendant by phone and confirmed that things were proceeding well with Ignacio. (GX 208-T).[4] During the call, the defendant confirmed the deal was proceeding, stating, "[I]t is all ready, we have an agreement already, and there is no problem." (GX 208-T at 6). Rodriguez and the defendant then discussed drug competition in the New York market. (GX 208-T). Specifically, Rodriguez told the defendant it was "essential . . . that everything turns out good" because there was "a lot of competition up there in New York" from Mexican drug traffickers, who he referred to using coded language. (GX 208-T at 23). The defendant said, "No problem, we are going to do that." (GX 208-T at 24). Rodriguez also asked if the defendant was aware of the money that would come "from New York," and the defendant affirmed, "Yes, yes." (GX 208-T at 15-22). A

---

[4] The defendant's sentencing submission incorrectly states that Rodriguez was a Special Agent for the DEA seeking to interdict kilograms of cocaine in Cartagena, Colombia. *See* Def. Mem. at 5. As Rodriguez testified at trial, he was a paid confidential source working for the DEA—not a Special Agent—as part of its investigation into the defendant and his co-conspirators in Bolivia. No aspect of this case had anything to do with Colombia.

still image of the defendant speaking on the phone with Rodriguez, as captured in the video recording taken by Ignacio, is below:



Around this same time, in approximately November 2019, the defendant was demoted in the midst of the political unrest surrounding Morales's removal from the Bolivian presidency. (Tr. 240:2-3, 240:21-25). The defendant, who remained politically powerful even after his demotion, maintained a senior leadership position in FELCN, and arranged for the selection of his successor—an individual whom, as described below, the defendant made clear to his co-conspirators would continue to facilitate their drug trafficking. (Tr. 241:2-15).

### F.   December 2019: The Defendant's Co-Conspirators Provide a 10-Kilogram Sample of Cocaine in Lima, Peru

On December 10, 2019, Ignacio, Rodriguez, and another DEA confidential source ("Jaime") traveled to Lima, Peru to meet with Rojas, who had been sent to Peru by the defendant to participate in the exchange of a sample of cocaine in anticipation of the contemplated cocaine deal. (Tr. 240:21-241:24).

The next day, co-defendant Romulo Ramirez ("Ramirez")—responsible for sourcing the cocaine and coordinating the sample sale of cocaine—sent a courier known as "Zapato" to deliver the sample of cocaine. (Tr. 498:18-499:13, 406:19-25). Zapato met with Raphael Romero, an undercover DEA agent who was posing as a courier for the CSes, at a KFC eatery in Lima, and Zapato provided Romero with a bag filled with 10 kilograms of cocaine, each stamped with "959." (Tr. 406:19-411:3, 412:3-413:22). That sample of cocaine subsequently tested positive for 10,047 grams of cocaine hydrochloride with 97% purity. (GX 1001). Below are photographs of those kilograms of cocaine:



Minutes after this exchange, the DEA confidential sources, Rodriguez and Jaime, met with Ramirez and Rojas inside a nearby hotel, where Rodriguez provided Rojas with $24,000 cash. (Tr. 503:18-25, 504:4-12, 509:7-16; GX 211A-T). Because the parties had initially agreed only on six kilograms, however, the CSes explained they would send payment for the other four kilograms later. (Tr. 500:1-5, 501:14-21, 503:4-25). Rojas provided a portion of the money to Ramirez, who left. (Tr. 510:13-511:24). During this meeting, the CSes and Rojas also discussed the details of the more-than-one-ton kilogram cocaine transaction, including the high quality of cocaine that buyers in the New York market expect. (GX 211A-T through 211H-T). Rojas advised the CSes that the defendant would charge approximately $2,000 per kilogram for use of the airport with the defendant's protection and assured the CSes that the defendant paid to place a trusted individual in the defendant's former position as Director of FELCN and would be able to continue safeguarding cocaine shipments out of Bolivia through those connections. (Tr. 524:17-525:7, 520:2-19, 522:25-523:9; GX 211F-T at 12-14, 19-20, 23-29; GX 211G-T at 8, 14-18). Following the delivery of the cocaine sample to the CSes, Rojas called the defendant and "told him that everything was ready—all of the meetings had been held, the sample had been delivered, and the money had been received and delivered to the owner of the cocaine." (Tr. 244:21-24). The defendant replied, "No problem. Keep me informed." (Tr. 245:2-4).

Three days later, on December 14, 2019, during a recorded phone call with Rodriguez, the defendant confirmed his awareness of the successful Lima delivery and indicated he was still prepared to secure the larger cocaine shipment when the CSes were ready.  (Tr. 532:7-536:6; GX 212-T).  During that call, Rodriguez used coded language to thank the defendant for his help in obtaining the ten-kilogram sample that would be sent to New York.  (GX 212-T at 5-8).  Specifically, Rodriguez said, "thank you very much for the help with those ten girls," or "muchachas" in Spanish, and the defendant responded, "Okay."  (GX 212-T at 5-6).  Rodriguez and expert witness DEA Special Agent Eric Putnam both testified that "muchachas" is a well-known code word for kilograms of cocaine.  (Tr. 544:7-12, 602:18-604:4, 820:15-20).  During the December 14, 2019 call, Rodriguez continued, "We will send, we will send them for service over there, to where our friends are, the ones with the hat," or "sombrero" in Spanish.  (GX 2120T at 7).  Rodriguez testified that his reference to the friends with the sombreros was a reference to New York, which Rodriguez previously used when speaking to the defendant about three weeks earlier, on November 21, 2019.[5]  (Tr. 534:1-535:11; *compare* GX 212-T at 7 *with* GX 208-T at 23).  During the December 14, 2019 call, as soon as Rodriguez made reference to the sombreros, the defendant cut him off and shortly thereafter ended the phone call.  (Tr. 535:5-15; GX 212-T at 7-8).

Following the call with Rodriguez, during a recorded meeting on the same day, December 14, 2019, the defendant clarified with Ignacio which cocaine deal Rodriguez was referring to.  Specifically, the defendant asked, "[W]hich woman did we help with?"  (GX 213-T at 35).  Ignacio replied, "[T]he ten devices ["aparatos" in Spanish] that were sent to Peru," and the defendant responded, "Okay," and agreed to send Ignacio a new private phone number to contact him.  (GX 213-T at 35-43).[6]  The defendant ended the meeting with Ignacio on December 14, 2019 by telling Ignacio, "Dot your I's and cross your T's brother, so we don't have any problems, brother."  (GX 213-T at 47).

### G.  January 2020: The Defendant Learns About the Wire Transfers from New York

Thereafter, on January 17, 2020, to complete payment for the remaining four kilograms of cocaine from the 10-kilogram sample received in Lima, $16,000—split between a $9,000 and a

---

[5] During the recorded call between Rodriguez and the defendant on November 21, 2019, Rodriguez emphasized to the defendant that the cocaine quality had to be high in order to compete with Mexican drug traffickers in the New York market, or those who wore sombreros.  Specifically, Rodriguez said, "[I]t's essential that, you know that these guys from Mexico, the one with the hats ["los sombrerudos" in Spanish] have a lot of competition up there in New York, that everything turns out good, that it would be the same[.]"  (GX 208-T at 23).  The defendant replied, "Okay.  No problem, we are going to do that."  (GX 208-T at 24).

[6] Rojas, J. Montano, and Special Agent Putnam all testified that "aparatos" or "devices" is a code word used by drug traffickers to mean cocaine, (Tr. 246:3-14, 666:21-25, 820:21-821:7), and Rojas explained that ten devices meant ten kilograms of cocaine (Tr. 246:13-14).  The defendant claimed at trial that he did not know they were referring to kilograms of cocaine, (*see* Tr. 896:16-897:2); however, he now argues in his sentencing submission that he knew about the ten-kilogram sample delivery, (Def. Mem. at 3).

$7,000 payment—was wired from a DEA undercover account based in New York to a Bolivian bank account used by Rojas. (Tr. 369:6-21, 371:7-10, 373:7-374:4, 377:14-380:4; GX 1106; GX 1107). Following the receipt of the funds, Rojas told the defendant "that the earnings from the cocaine that had been delivered in Peru had been sent to us," and "that the money had come from the United States, New York." (Tr. 248:3-7). The defendant replied, "Don't talk to me about that." (Tr. 248:8-11).

### H.    February 2020: The Defendant Confirms That He Knows the Cocaine is Going to the U.S. and He Wants to Move Forward with the Deal

A few weeks later, the defendant invited Rojas to meet with him at his hotel room in Bolivia. (Tr. 248:16-25). The defendant asked Rojas how the deal was going, and then stated, "I don't think that this deal is going to Punta Cana or to Mexico. It's—it must be going to the U.S., because that's the largest market." (Tr. 249:11-13). The defendant then continued, "We don't give a shit. Let the—let it go wherever it's going to go. The important thing is that the plane should take off and that we receive our money." (Tr. 249:18-20).

On February 17, 2020, during a recorded call with Rodriguez, the defendant reaffirmed his intention to move forward with the cocaine deal. (GX 217-T). Specifically, Rodriguez informed the defendant that the "girls" or "muchachas"—code for the 10-kilogram cocaine sample—had "arrived at the place," and that people are happy. (GX 217-T at 8-10). Rodriguez then asked if the defendant wanted to continue and the defendant said, "Positive." (GX 217-T at 10-11). When Rodriguez asked if "we still have the coverage"—the armed protection for the cocaine shipment the defendant agreed to provide—the defendant replied, "We are already all set. . . . [W]e have made all the necessary arrangements, we have everything. . . . [I]t's all up to you now . . . to move the situation forward." (GX 217-T at 12-13). During that call, the defendant further confirmed that he had the means to launder money in furtherance of the parties' anticipated cocaine deal. (GX 217-T at 14-20).

Given the onset of the COVID-19 pandemic in early 2020, and the resulting travel restrictions, communications between the parties about the anticipated cocaine deal slowed significantly. (Tr. 252:8-24, 253:4-18, 547:7-14). Nevertheless, the DEA confidential sources continued to communicate with the defendant's co-conspirators about the production of the cocaine and their collective desire to move forward with the deal. (*Id.*). For example, during an April 1, 2020 call between Rodriguez and Ramirez, Ramirez indicated that they could produce the quantities of cocaine sought by Rodriguez's network once delays from the COVID-19 pandemic cleared up. (GX 218A-T at 16-29). During that conversation, Rodriguez also told Ramirez that the cocaine sample delivered in Lima was well-received in the competitive New York market. (GX 218A-T at 18). Rodriguez then asked if he could tell his New York customers to expect that Ramirez would manufacture the same product for the planned shipment, and Ramirez confirmed. (GX 218A-T at 19-27).

## II.    The Defendant's Testimony at Trial

Over the course of two days at this trial, the defendant testified falsely, incredibly claiming that during the recorded calls and meetings shown to the jury in which he agreed to provide armed

protection for a 1,200-kilogram cocaine shipment heading to the United States, he actually was acting as an undercover police officer (outside official channels but on behalf of the Bolivian government) and was working to arrest everyone else. (Tr. 877:24-878:21, 889:14-17, 891:4-7, 892:15-20; 893:1-8, 896:20-22, 898:21-899:2; 910:12-16; 921:18). The defendant claimed, "I am working to fight against narcotraffickers, not to help narcotraffickers." (Tr. 892:19-20). The defendant told the jury that he had two "hypotheses" in his so-called investigation: (1) that Ignacio, Rodriguez, and his co-conspirators were actual drug traffickers and he was trying to dismantle their organization (Tr. 878:14-15, 893:23-24; 907:16-24; 908:15-909:12; 934:20-935:3, 937:10-12), or (2) that Ignacio and Rodriguez were really working for the United States DEA (Tr. 893:25-894:1, 895:2-14). But, either way, the defendant claimed he did not intend to send cocaine to the United States and would have arrested the narcotics traffickers had he not been arrested first. The defendant further testified that he lied during his proffers with the Government at the direction of his then-attorney, something he was willing to do for "my freedom." (Tr. 912:20-25, 914:1-6, 919:8-20, 921:23-25, 923:9, 923:25-924:1, 928:18-23, 944:1-5, 944:20-21).

During cross-examination, the defendant acknowledged that during his proffers with the Government, he told the Government: that he agreed to provide coverage for this cocaine deal (Tr. 940:10-12); that he had the power to provide that coverage because he was the director of FELCN (Tr. 940:13-16); that he planned to order FELCN officers to provide protection for the plane at the airport; (Tr. 916:13-16, 917:20-918:2); and that the FELCN officers at the airport would be carrying their service weapons, including M-16s, pursuant to Bolivian regulations (Tr. 918:3-919:1).

During re-direct examination, the defendant doubled down on his perjury and again claimed that what he told the jury during direct examination was the truth. (Tr. 956:11-13).

## III.  Deliberations and the Jury's Verdict

The jury began deliberations at 3:06 p.m. on October 22, 2025 and reached a verdict the following day at 11:40 a.m. (Tr. 1062:21, 1084:16). While deliberating, the jury requested and was provided the entirety of the defendant's trial testimony.[7] (Tr. 1065:23-24, 1071:19-21; 1077:7-22). The jury also requested "to further understand the definition of 'control' used in the definitions of 'carry' and 'possession' in Count Two," (Tr. 1079:6-8), and the Court provided clarifying instructions, (Tr. 1082:23-1084:3).

Thereafter, the jury returned a guilty verdict on all counts. (Tr. 1084:23-24, 1085:4-7). In addition, the jury further found that as to Count One, it was reasonably foreseeable to the defendant

---

[7] The jury also requested to see "the letter that was sent from the defendant to the Court on Monday that was referenced . . . in court." (Tr. 1065). This was not provided to the jury because it was not received in evidence. (Tr. 1070:4-10). However, in that letter, the defendant claimed, in sum and substance, that his attorneys and U.S. authorities were conspiring against him. (*See* Tr. 697:8-13 (as summarized by the Court, "He also feels that his first attorney . . . betrayed him, and that the notes of the proffer statement are not accurate and reflect lies that the defendant told at the instigation of his prior counsel.")).

that five kilograms or more of cocaine would be imported into the United States through the conspiracy; and found as to Count Two that the firearms conspiracy included using or carrying machineguns during and in relation to the conspiracy charged in Count One, or to knowingly possess machineguns in furtherance of the conspiracy in Count One. (Tr. 1084:23-1085:14).

## IV.  The Applicable Guidelines Range and the PSR

### A.  The Applicable Guidelines Range is Life Imprisonment

The applicable Guidelines sentence is life imprisonment, based on a total offense level of 50 (capped at 43 by the Guidelines) and a Criminal History Category of I.  The calculation is as follows.

To start, Counts One and Two are grouped together, pursuant to U.S.S.G. § 3D1.2(c), since, as described below, Count Two embodies conduct—specifically, the firearms conduct—that is treated as a specific offense characteristic in or adjustment to the Guidelines applicable to Count One.  As such, the applicable offense level for the group is the offense level that produces the highest offense level under the Guidelines, which, as described below, is Count One.

The base offense level for Count One is 38 pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1), because the defendant conspired to distribute over 450 kilograms of cocaine; and, more specifically, approximately 1,200 kilograms. The evidence at trial established that the conspiracy contemplated this amount of cocaine, which was discussed at multiple meetings, and that the defendant knew and agreed to provide protection for a shipment of that magnitude. (*See, e.g.*, GX 202-T at 3 (Ignacio telling the defendant that the deal involved "one thousand two hundred" kilograms that would transit through Punta Cana in the Dominican Republic)).  The defendant's Guidelines calculation must therefore account for the quantity of cocaine that he conspired to import to the United States, not just, as the defendant argues, (*see* PSR at 28-29), the ten kilograms of cocaine that were delivered in Peru as a sample in anticipation of the larger deal. *See, e.g.*, *United States v. Johnson*, 633 F.3d 116, 118 (2d Cir. 2011) ("It is well settled that individual defendants are responsible for all reasonably foreseeable quantities of drugs distributed by a conspiracy of which they were members.").[8]

Next, several specific offense characteristics increase the Guidelines calculation.  First,

---

[8] As noted above, the defendant now argues that "in his professional capacity, he was conspiring to deliver 10 kilograms as part of his effort to arrest the members of what had been presented to him (by Agents of the Drug Enforcement Administration) as a drug trafficking ring."  That is inconsistent with the defendant's testimony at trial, at which he falsely stated that he did not know about any drugs being delivered in Peru as a sample for the deal and was not familiar with slang terms used to refer to those ten kilograms. (*See* Tr. 896:16-897:2)).  Neither of the defendant's self-serving explanations are credible, nor do they help him avoid responsibility for the full weight of the conspiracy because he explicitly discussed and assented to a quantity far in excess of the top weight contemplated by the Guidelines. The Government respectfully asks the Court to disregard the defendant's unsupported arguments for applying a lower Guidelines calculation under U.S.S.G. § 2D1.1(a)(5) and (c)(1). (*See* Def. Mem. at 3).

because the defendant conspired to use and possess firearms in furtherance of the cocaine trafficking offense, as reflected by the jury's guilty verdict on Count Two and significant evidence at trial, a two-level increase is warranted. *See* U.S.S.G. § 2D1.1(b)(1). Another two-level increase is warranted because the conspiracy contemplated the use of an aircraft other than a regularly scheduled commercial air carrier to import cocaine. *See* U.S.S.G. § 2D1.1(b)(3)(A). Indeed, one of the primary functions the defendant agreed to perform in this conspiracy was to provide armed protection for an airplane while it was loaded with cocaine. (*See e.g.*, GX 209A-T at 31-36, 46-53) (the defendant agreeing to assign a particular FELCN commander and his team to provide protection for the shipment once it arrived at the airport in Bolivia).

The Guidelines are similarly increased by multiple provisions in Chapter Three. First, because the defendant, who abused his position as the Director of FELCN to enable, coordinate, and supervise logistics at every level of the cocaine trade, was the leader of a criminal conspiracy that involved five or more participants, a four-level increase is warranted. *See* U.S.S.G. § 3B1.1(a). As the defendant stated during a recorded meeting, and as was understood by other members of the conspiracy, the defendant had the authority to, and in fact agreed to, order corrupt FELCN officers under his command to provide protection for the anticipated shipment. (*See, e.g.*, GX 209A-T at 31-36, 46-53). The trial evidence also thoroughly established that without the defendant's official cover, the conspiracy could not proceed as discussed. The defendant was not only the official linchpin to the conspiracy but also maintained that role by virtue of his literal authority to control numerous subordinates through FELCN. Aside from the defendant's role in securing the aircraft and airfield to be loaded with cocaine, he also maintained a leadership role by offering security to the cocaine producers. Across multiple meetings, and during trial testimony, J. Montano and others made it clear that cocaine manufacture in Bolivia was specifically managed by the defendant, who enjoyed extensive payments in exchange for his protection racket. The defendant thus sat atop the cocaine conspiracy, using his authority, weaponry, and personnel to safeguard his own cocaine production, eliminate that of rivals or those who would not pay, and safeguard the exportation of the product. No member of the conspiracy came close to enjoying the same level of authority or share of the profits. *See* U.S.S.G. § 3B1.1 Application Notes 2-4. The defendant's control of over five or more participants was clearly established through trial testimony regarding at least J. Montano, H. Montano, Cahuana, Rodriguez, Rojas, and others, but also was justified because the criminal activity was definitionally "otherwise extensive." Finally, and for all the reasons discussed herein, the defendant blatantly abused a position of public trust in furtherance of the offense, specifically, his position as Director of FELCN, warranting another two-level increase. *See* U.S.S.G. § 3B1.3.

Finally, because the defendant obstructed justice by committing perjury during trial, another two-level increase is warranted. *See* U.S.S.G. § 3C1.1. While the defendant maintains his innocence and disputes the factual assertions in the PSR, the jury clearly rejected his false testimony that (a) he previously lied to the Government about his commission of the charged offenses, including at the supposed direction of his then-lawyer, and (b) he conducted an undercover operation during his recorded meetings with co-conspirators and DEA confidential sources. The defendant's false testimony was flatly contradicted by the evidence at trial and was clearly discredited by the jury, who returned a verdict convicting the defendant of all counts. The record also includes the defendant's own prior admissions to the Government, which spanned two proffer interviews and an attorney proffer by prior counsel. During those meetings, the defendant

extensively recounted his own conduct, as well as drug trafficking by others, under the provisions of a proffer agreement and in hopes of obtaining credit for his cooperation.[9]

Under the Guidelines, such false trial testimony is an appropriate basis for imposing an obstruction of justice enhancement.  *See* U.S.S.G. § 3C1.1, Application Note 4(b); *see also United States v. Matos*, 907 F.2d 274, 275-76 (2d Cir. 1990) (upholding imposition of two-level upward adjustment where defendant offered testimony that was flatly contradicted by the record).  Because "[t]here is no protected right to commit perjury," *United States v. Grayson*, 438 U.S. 41, 54 (1978), penalizing a defendant at the sentencing stage for false statements made at trial does not violate the defendant's right to testify on his own behalf.  *See id.*  Rather, an enhancement for obstruction of justice is wholly warranted when the jury verdict contradicts the defendant's factual testimony. *See, e.g.*, *United States v. Stewart*, 686 F.3d 156, 174-78 (2d Cir. 2012) (affirming enhancement where "[t]he jury's findings contradicted Stewart's factual testimony to the effect that she did not engage in this conduct, or at least did not do so knowingly"); *United States v. Bonds*, 933 F.2d 152, 155 (2d Cir. 1991) (citation omitted) ("[B]y finding Bonds guilty of *knowingly* distributing counterfeit money, the jury necessarily determined that Bonds knew that the money he had distributed was counterfeit" and, therefore, that Bonds lied at trial).  Where, as here, a defendant perjured himself and attempts to obstruct proceedings, "[i]t is rational for a sentencing authority to conclude that a defendant . . . [is] attempt[ing] to avoid responsibility" and therefore is "more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process."  *United States v. Dunnigan*, 507 U.S. 87, 97 (1993).  That is because "[t]he perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury." *See id.* at 98.  That is clearly the case here.

The total offense level is, in "one of those rare instances," calculated to be in excess of 43, for a total of 50.  *See* U.S.S.G. § 5A, Application Note 2.  Pursuant to U.S.S.G. § 5, the offense level is therefore adjusted to the highest offense level in the Guidelines, 43.  And because the defendant has no prior criminal convictions, he is in Criminal History Category I.  With a total offense level of 43 and a Criminal History Category of I, the applicable Guidelines sentence is life imprisonment.[10]

---

[9] Of course, lying during proffers is also grounds for a Guidelines enhancement under U.S.S.G. § 3C1.1. (*See e.g.* U.S.S.G. § 3C1.1 Application Note 4 ("providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense," is one example within a "non-exhaustive list" of the "types of conduct to which this adjustment applies").  Although the defendant's own explanation for his trial testimony would create an independent basis for the Court to conclude the obstruction enhancement is appropriate in this case, the Government does not credit the defendant and respectfully asks the Court to conclude the Guideline is appropriate on the basis of the defendant's obviously perjured trial testimony.  It is important, however, to note that even under the defendant's explanation he admits knowingly and repeatedly lying in an attempt to manipulate the outcome of his pending criminal case.

[10] The defendant argues that he is entitled to a two-level reduction as a zero-point offender under U.S.S.G. § 4C1.1.  The defendant is wrong.  He is disqualified from such a reduction both because

The Probation Department reached the same Guidelines sentence of life imprisonment, although it did not apply points for obstruction of justice, noting that the Probation Department "defers to the Court" because the Court is in the best position to determine whether such an enhancement is warranted. (*See* PSR ¶ 69). As described above, the defendant's perjury unquestionably justifies that enhancement.

## B.  The Defendant's Objections to the PSR

The defendant raises two primary objections to the PSR. First, the defendant "disputes the contention of Paragraphs 21 through 41," which set forth the offense conduct in the case. (PSR at 28). The defendant maintains that he was operating in an undercover capacity and that he previously lied to the Government about his guilt during proffer sessions at the supposed direction of his then-counsel. (*Id.*). As described above, the defendant's perjurious testimony about his innocence, his purported undercover operation, and his lying about his guilt at the direction of his attorney was rejected by the jury, which returned a guilty verdict in fewer than five hours of deliberation. The defendant's contention is also entirely contradicted by the overwhelming evidence of his guilt at trial, including the numerous recordings that were introduced and the testimony of three witnesses with firsthand involvement in the planning of the anticipated cocaine deal. Accordingly, the Court should overrule the defendant's blanket objections to the offense conduct section of the PSR in their entirety.

Second, the defendant disputes that he should be held liable for conspiring to import 1,200 kilograms of cocaine and, instead, argues that the applicable drug weight for purposes of a Guidelines calculation should be limited to the ten kilograms of cocaine that were delivered by the defendant's co-conspirators in Peru. (PSR at 28-29). As described above, the defendant's objection is both factually and legally flawed. *See supra* Section IV.A. Accordingly, the defendant's objection to the applicable base offense level should also be overruled.

## C.  The PSR's Sentencing Recommendation

The Probation Department recommends a below-Guidelines sentence of 180 months' imprisonment. (PSR at 31). Probation has made clear, however, that this recommendation does not account for the fact that the defendant committed perjury and obstructed justice (because Probation left that determination to the Court) and, by extension, does not appropriately reflect the defendant's complete failure to accept responsibility for his offenses. As part of its justification, the Probation Department emphasized that the defendant, in "using his position to trust as a Bolivian law enforcement officer," was entrusted with "carrying out operations against drug traffickers in Bolivia" but nevertheless, "as the leader of the criminal activity, diverted law enforcement resources away from investigating certain cocaine traffickers and provided heavily armed FELCN personnel, who were armed with machineguns and other firearms, as security for

---

he receives an aggravating role enhancement as a leader under U.S.S.G. § 3B1.1 and, separately, because he conspired to use and possess firearms in furtherance of the offense. *See* U.S.S.G. § 4C1.1(a)(7), (10). In any event, even if the defendant were eligible for such a reduction, which he is not, it would not impact the Guidelines range, since it would still result in an offense level of 48—five points greater than highest offense level in the Guidelines at which he is capped.

cocaine shipments." (*Id.*). Probation recognized that the defendant is responsible for "conspiring to import at least 1,200 kilograms of cocaine," that he was "motivated by monetary gain," and that "by violating ethical and legal obligations as a law enforcement officer, [he] not only committed a crime, but he also betrayed the public's trust." (*Id.*). Despite the gravity of the defendant's conduct and his abuse of public trust, Probation stated that it believed there were certain mitigating factors, including that he has no known criminal convictions in Bolivia and that he is ineligible for certain potential sentencing reduction relief because of his conduct, that counsel in favor of a downward variance. (*Id.*).

As set forth below, the Government respectfully submits that Probation's sentencing recommendation is far too low because it fails to account for the defendant's much more significant role as compared to other defendants sentenced in this case and others, and does not take into consideration the defendant's brazen perjury and attempts to obstruct justice.

## DISCUSSION

### I.   A Guidelines Sentence of Life Imprisonment is Warranted in this Case

The Government respectfully submits that a Guidelines sentence of life imprisonment is appropriate in this case. In particular, and as set forth below, the seriousness of the offense, the history and characteristics of the defendant, the need to promote respect for the law, and the importance of achieving deterrence all support the imposition of such a sentence.

#### A.   The Nature and Circumstances of the Offense

As an initial matter, the nature and circumstances of the offense alone merit a Guidelines sentence. *See* 18 U.S.C. § 3553(a)(1).

In terms of drug weight, the defendant conspired to import over one metric ton of cocaine into this country, an amount well-beyond the five-kilogram quantity of cocaine that suffices to trigger a 10-year mandatory minimum sentence. That is enough cocaine to flood this community for years and place him comfortably within (and, indeed, well above) the highest bracket of the Guidelines Drug Quantity Table. And this was not a one-time aberration or a momentary lapse; the evidence introduced at trial established that the defendant, as a career law enforcement officer who reached the highest level of the Bolivian counternarcotics world, abused his power to work with drug traffickers and corrupt law enforcement officials in Bolivia to facilitate the trafficking of massive cocaine shipments as they left Bolivia on their way to their final destinations, including to the United States. Few drug-trafficking cases involve such staggering amounts of cocaine. Indeed, "the harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, 16 Cr. 453 (RJS), Dkt. No. 160, at 27; *see also United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) ("[T]he drugs at issue here cripple individuals and destroy families and whole communities."). Here, the defendant endeavored to participate "in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and he "was indifferent to the poison that was being distributed and ruining people's lives." *United States v. Aguirre Cuero*, 15 Cr. 125 (PKC)

(Dkt. No. 36, Tr. 22, 24).

Drug trafficking on the scale to which the defendant participated, however, does not just affect individuals, families, and local communities—it destabilizes entire nations, like Bolivia, before ultimately causing harm here in the United States. *See, e.g.*, *United States v. Gomez*, 18 Cr. 262 (VEC), Dkt. 170 at 26 (Jan. 27, 2023) ("Cocaine is a dangerous drug, which destabilizes communities when it gets down to the retail level. At the wholesale level, [as present here], it destabilizes nations[.])" As Judge Schofield summarized when imposing sentence on a corrupt Honduran police officer in another case in this District:

> It is sometimes difficult in drug cases to realize how serious the crime is and its impact on people, but I am sure just from looking at the society in Honduras and how it has been ravaged by drug dealers, that you have seen how serious and how negative drugs can be on the population in many ways, and so it is not just the people in Honduras that have been affected, it is also the people in the United States who were the ultimate consumers and buyers of these drugs.

*See United States v. Valladares Garcia*, 15 Cr. 174 (LGS) (Dkt. No. 357, Tr. at 20); *see also United States v. Cabezas Garcia*, 17 Cr. 23 (RJS) (Dkt. No. 71, Tr. 21) ("When people decide to assist organized crime enterprises, they have to understand the consequences that are caused by that in multiple countries. It is a serious crime."); *United States v. Henao-Montoya*, 21 Cr. 692 (VEC), Dkt. No. 147 at 26 ("While there is a substantial amount of debate in the United States over over-incarceration of low-level drug dealers who are frequently only supporting their own habits, there is widespread agreement that large-scale drug dealers should spend a long time in prison because what they do is so detrimental to society"). The staggering drug quantity involved in this case, and the international scope of the defendant's conduct, alone support the imposition of a Guidelines sentence.

But it is the defendant's specific role in the offense—specifically, his shocking abuse of power as Bolivia's top counternarcotics officer—that further underscores the need for a Guidelines sentence. As described above, the significant value the defendant brought to this conspiracy was his position atop FELCN, which he abused to conspire to import over one ton of cocaine to the United States. The defendant began participating in this conspiracy just months after being appointed to the position and was already working with other drug traffickers at the time he agreed to provide armed protection for this deal. Throughout the course of the conspiracy, the defendant was intimately involved in the discussions about the deal, including about how he would direct armed FELCN officers to make sure that the plane his co-conspirators sought to use to transport the cocaine out of Bolivia could be safely loaded with cocaine. The defendant's immense influence and power, which he wielded to further the conspiracy, and his familiarity with facilitating drug shipments, was on full display as he openly discussed the potential to use various airports in Bolivia, including the Viru Viru international airport, as potential options for the plan. By way of example, an excerpt of the defendant's recorded statements to Ignacio in July 2019 about the deal, and the defendant's proposals about various airports to use and the protection he would provide, is below:

> You look for it then, wherever they give you permission. And you tell me and . . . we will provide the coverage, then. But do not speak to anyone else about it. . . . It

could be from Riveralta or Guayara.  Those are the key points. . . . Or if not . . . it would have to be Viru Viru. . . . Now, if the flight plan is made for Riveralta or Guayara[,] brother, the load has to arrive there.  So you come to an agreement, brother.  If they can do it in Guayara, in Riveralta, brother.  There, the day they operate, I will do an operation for example, in Santa Rosa.  I will take out everyone.  And brother, . . . this is with coverage. . . . [W]e will have one or two idiots, dumbasses, there brother in a "lobo" . . . protecting the plane. . . . I mean, the police who provide security at the airport, the ones from FELCN just pretend not to notice.

(GX 202-T at 4-6).  As the deal progressed over several months, the defendant continued assuring his co-conspirators that he would provide protection for the deal and even acknowledged that he knew the cocaine was destined for the United States. (Tr. 249:11-20) (Rojas testifying that the defendant said, "I don't think this deal is going to Punta Cana or to Mexico.  It's—it must be going to the U.S., because that's the largest market. . . . We don't give a shit.  Let . . . it go wherever it's going to go.  The important thing is that the plane should take off and that we receive our money.").  And the defendant did not play a passive role or have minimal contact with his co-conspirators— he regularly met with them in person and spoke with them by phone to discuss all facets of the deal, from the protection he agreed to provide to the ten kilograms of cocaine that were delivered as a sample for the 1,200-kilogram shipment.  Put simply, the defendant was the single most important person in the deal and was unquestionably the leader of the conspiracy upon whom all other co-conspirators relied on to ensure the anticipated deal would be a success.  Without the defendant's protection, the cocaine itself would not be manufactured, and any that did exist could not so easily use airfields and aircraft without the significant risk of detection such trafficking typically entails.  The gravity of the defendant's conduct thus cannot be overstated.

To make matters worse, once in the United States, the defendant attempted to perpetrate a fraud upon the Court and the jury, baselessly impugning members of the bar and law enforcement and seeking to obstruct justice by committing perjury.  As described above, the defendant took the stand at trial and fabricated a story that sought to explain why, as the Director of FELCN, he was captured on surreptitiously made video and audio recordings meeting with drug traffickers about arranging a 1,200-kilogram shipment of cocaine to the United States.  The defendant claimed at trial, as he does again now, that he was actually conducting a secret undercover operation to target drug traffickers, and that his prior admissions to the Government about his conduct in this case— made before he saw many of the recordings at issue—were at the behest of his then-attorney who supposedly counseled the defendant to falsely incriminate himself.[11]  The defendant's outlandish lies on the stand, which were swiftly rejected by the jury, were (and continue to be) an affront to the fair administration of justice and the truth-seeking function of a criminal trial.  And they are a significant aggravating factor that, in combination with the seriousness of the underlying crime itself, further justifies the imposition of a Guidelines sentence.

---

[11] Although the defendant claims he was operating in his official capacity on behalf of the Bolivian government, the defendant has offered no clear explanation for why that same government arrested the defendant and judicially authorized his extradition on the instant charges.

### B.   History and Characteristics of the Defendant

The history and characteristics of the defendant also speak to the need for a significant sentence.  *See* 18 U.S.C. §§ 3553(a)(1).  The defendant had ample opportunity to lead a law-abiding life and chose not to do so.  As set forth in the PSR, the defendant obtained an education, graduated from the police academy in Bolivia, and spent almost three decades as a law enforcement officer in Bolivia, eventually being appointed to serve as Director of FELCN.  The defendant thus cannot point to poverty, lack of opportunity, or a need to support his family through narcotics trafficking as an excuse or mitigating consideration for his conduct.  He cannot claim that he had no other choice or path forward or was forced to support his host of cocaine trafficking allies.  Quite the contrary—despite having every opportunity to lead a law-abiding life and being entrusted by the Bolivian public with doing so, the defendant chose one of the most destructive paths possible.  He relied on his decades of law enforcement experience and abused his power to protect and support drug traffickers and their cocaine shipments.  There is simply no excuse for that conduct, particularly from someone like the defendant, who had every opportunity to do the right thing and did the exact opposite.

The duration of the defendant's crimes also speaks to the need for a serious sentence in this case.  This was not a one-time event arising, for example, from a split-second decision made under financial distress.  The defendant was not a young, immature man influenced by those around him to participate in illegal conduct.  Rather, the defendant's crimes were the product of a series of decisions—made by a career law enforcement officer who was ostensibly at the top of his profession—over the course of at least several months and it was within his power to stop committing those crimes at any point in time.  But the defendant apparently disregarded, or as he told Rojas, did not "give a shit," (Tr. 249:18-20), that he was working directly with drug traffickers who sought to export cocaine from Bolivia to flood the United States with that cocaine.  Time and again throughout the course of this conspiracy, he chose to betray the people he vowed to serve and engage in corruption and large-scale drug trafficking for his own financial gain.

Nor is the defendant's lack of a prior criminal record in Bolivia a surprise: the defendant was a former law enforcement officer, who was politically connected to the three-term former President of Bolivia, Evo Morales, and who was appointed to serve as the Director of FELCN.  It comes as no surprise to anyone that an influential and corrupt law enforcement officer like the defendant was able to commit his crimes unabated and without consequence.  And he did so alongside other drug traffickers, including his co-defendants, whom have each been prosecuted and convicted in this District.  As was evident from the evidence introduced at trial, the ecosystem of corruption that the defendant nurtured within Bolivian law enforcement under his command and during the period of the charged conspiracy is precisely why an individual like the defendant could avoid arrest and prosecution for those crimes. The defendant's post-arrest conduct, for the reasons outlined above, similarly foreclose any argument that he has accepted responsibility or has displayed any compunction about his stunning abuse of office.  The defendant's history and characteristics thus provide no justification for leniency in this case.

**C.   The Need to Afford Adequate Deterrence and Protect the Public**

Finally, the need to afford adequate deterrence, protect the public, and promote respect for the law also speaks loudly to the need for a significant sentence in this case.  *See* 18 U.S.C. §§ 3553(a)(2)(B)-(C).

With respect to specific deterrence and the need to protect the public, the defendant abused his powerful position to work as a large-scale drug trafficker.  As described above, although the defendant had every chance to lead a law-abiding life, when presented with the opportunity to participate in this international drug trafficking scheme, the defendant jumped at the chance and became the questionable leader in that scheme.  The defendant spent decades learning the operations of the drug trafficking world in Bolivia as a law enforcement and intelligence officer and exploited that knowledge to break the law for his own gain.  Should the defendant complete any sentence involving a term of years imposed by the Court, he will likely be removed to Bolivia, where, even in older age, he could return to a life of crime.  That point is particularly apt here, where the defendant continues to lie to the Court about his involvement in the crimes of which he was convicted at trial. *See, e.g.*, *United States v. Cox*, 458 Fed. App'x 79, 83 (2d Cir. 2012) (finding no abuse of discretion in district court's imposition of a 360-month sentence based on, among other reasons, the need for deterrence in light of the defendant's failure "to accept responsibility for his conduct").  The defendant continues to claim that he is as a victim of injustice who was treated unfairly by American authorities purportedly acting in violation of Bolivian law, despite that government's decision to extradite the defendant to the United States to stand trial for his crimes.  As such, the need to deter the defendant—who refuses to accept responsibility for his conduct and, instead, continues to lie about it—from committing crimes in the future and to protect the public also counsels in favor of a Guidelines sentence.

Just as important is the need for the sentence to afford general deterrence.  All corruption strikes at the heart of fair government and civil society.  A Guidelines sentence for a defendant who embodied the type of corruption that has allowed cocaine trafficking to flourish throughout Central and South America will resonate with any corrupt government officials engaging in, or tempted to engage in, conduct like that which the defendant committed here.  That aspect of the message resulting from the defendant's sentence is critically important because, without corrupt government officials like the defendant, the kind of large-scale, international drug trafficking at issue in this case, and the rampant drug-related violence that often follows it, is difficult if not impossible.  The deterrent effect of a Guidelines sentence on the defendant will thus not only resonate with corrupt officials around the world, but also to any whose lives have been harmed by drugs, violence, and corruption that the American justice system will prosecute and punish those who seek to take advantage of their official positions to promote and support drug trafficking.  Indeed, as this Court noted in imposing a sentence of 228 months' imprisonment on a former Honduran congressman who pled guilty to conspiring to import cocaine to the United States, a Guidelines sentence would "be a clear message that those holding public office will be punished severely for the crimes they commit when those crimes are a violation of U.S. law and on the scale represented by the defendant's conduct here." *Unites States v. Urbina Soto*, 18 Cr. 497 (DLC), Dkt. 52 at 18 (Nov. 8, 2024).

A Guidelines sentence would also serve as a deterrent to those who, like the defendant, may seek to commit perjury to subvert the American justice system. As described above, the seriousness of the defendant's conduct is exponentially compounded by his attempts to lie about his conduct at trial and underscores the need for a Guidelines sentence. Such a sentence would thus send a strong message to all criminal defendants that those who choose to commit perjury will be met with the harshest of consequences. *See, e.g., United States v. Palagio Suarez*, 16 Cr. 453 (RJS), Dkt. No. 160, at 27-28 (describing 292-month sentence as "a reflection of the decisions of Mr. Suarez to endeavor to game the system, to make false statements under oath," among other conduct, which "demonstrate[s] an absolute lack of acceptance of responsibility").

### D. A Guidelines Sentence is in Line with Sentences Imposed on Similarly Situated Defendants

A Guidelines sentence for the defendant would also be in line with sentences imposed on similarly situated defendants and those imposed on the defendant's co-defendants.

To start, a Guidelines sentence would not create unwarranted sentencing disparities among former high-ranking public officials who, like the defendant, abused those positions to facilitate large-scale international drug trafficking. By way of example, Fredy Najera, a former Honduran congressman, was sentenced to 360 months' imprisonment following a guilty plea and *Fatico* hearing at which the Government established, among other things, Najera's involvement in protecting massive cocaine shipments with machineguns. *See United States v. Fredy Renan Najera Montoya*, 15 Cr. 378 (PGG). Other elected officials, including former Honduran congressman Tony Hernandez, was sentenced to life imprisonment following his trial convictions for conspiring to import cocaine to the United States and related firearms offenses. *See United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC). Former Venezuelan general Cliver Antonio Alcala Cordones was sentenced to 260 months' imprisonment following a guilty plea for proving material support to a designated foreign terrorist organization, the FARC, and related weapons offenses, that enabled large-scale cocaine trafficking. *See United States v. Alcala Cordones*, S3 11 Cr. 205 (AKH). And former Honduran mayor Arnaldo Urbina Soto was sentenced by this Court to 226 months' imprisonment following a guilty plea for conspiring to import cocaine to the United States. *See United States v. Arnaldo Urbina Soto*, 18 Cr. 497 (DLC). While the facts and circumstances of each of those cases are unique, the sentences imposed nevertheless reflect that, where high-ranking public officials abuse their power to facilitate and participate in international narcotics trafficking, that conduct must be met with significant consequences, including decades in prison. Importantly, none of these comparison cases involve perjured trial testimony.

Moreover, a Guidelines sentence would also be in line with those imposed on other large-scale drug traffickers convicted at trial of conspiring to import cocaine to the United States and related weapons offenses. For example, Judge Broderick sentenced a Venezuelan drug trafficker who conspired to import ton quantities of cocaine to the United States to life imprisonment plus 30 years, following his conviction at trial. *See United States v. Orense Azocar*, 21 Cr. 379 (VSB).[12]

---

[12] Other drug traffickers involved in conspiracies to import massive quantities of narcotics, but who did not abuse their official government positions to do so, have received lengthy sentences in

Finally, a Guidelines sentence would also be in line with those imposed on co-defendants who have been sentenced to date, particularly given that the defendant is by far the most culpable and occupied the most dangerous role in the conspiracy as the leader of a large paramilitary force armed and at the direction of his corrupt leadership. None of the defendants in this conspiracy sentenced by this Court has had a role comparable to that of the defendant. For example, while Cahuana, H. Montano, and J. Montano had significant responsibility for the manufacture and provision of cocaine for the conspiracy, they were all subordinate to the protection of the defendant and, ultimately, performed roles as effective intermediaries between the true owners of the cocaine and the defendant who made it possible for the cocaine to leave Bolivia's borders. And, notably, those defendants were not convicted of the firearm offense in this case, they each pled guilty, and they did not commit perjury. Each of those defendants was sentenced to at least 120 months' imprisonment. And the defendant's comparisons to the sentence imposed on Carlos Robledo-Anez are inapposite; Robledo-Anez was not involved in the defendant's conspiracy. Robledo-Anez's role in a related conspiracy was to invest $5,000 in a relatively small quantity of cocaine

---

this district. *See, e.g.*, *United States v. Palagio Suarez*, 16 Cr. 453 (RJS), Dkt. No. 160 (cook on vessel transporting cocaine, who falsely testified and committed perjury, sentenced to 292 months' imprisonment); *United States v. Henao-Montoya*, 21 Cr. 692 (VEC), Dkt. No. 147 (defendant who agreed to import thousands of kilograms of cocaine to the United States, and directed his underlings to deliver 8-kilogram sample of cocaine, sentenced to 24 years' imprisonment); *United States v. Ramir Anibal Gomez Luna*, 21 Cr. 562 (LAP), Dkt. 36 (imposing 210-month sentence for defendant who admitted to having access to ton-quantities of cocaine, delivered five-kilogram cocaine test sample, and sold two firearms to a confidential source); *United States v. Munoz Gallon*, 22 Cr. 357 (KPF), Dkt. 36 (imposing 180-month sentence after guilty plea for defendant who brokered 3-kilogram cocaine deal in furtherance of ton-quantity cocaine importation conspiracy); *Palacio Mena*, 22 Cr. 121 (LJL) (imposing 168-month sentences after guilty pleas for two defendant who brokered 5-kilogram cocaine deal in furtherance of ton-quantity cocaine importation conspiracy); *United States v. Gorgeech*, 21 Cr. 559 (SHS), Dkt. 68 (imposing 240-month sentence where defendant a native of Pakistan, provided confidential sources with a seven-kilogram sample of heroin from his laboratory in Afghanistan, assured the confidential source that he could arrange for 1,000 kilograms of heroin, and then received payment of $35,000 for the seven-kilogram heroin sample); *United States v. Balouchzehi*, 21 Cr. 658 (JMF), Dkt. 110 (imposing 240-month sentence where defendant, a native of Iran, arranged for a courier in Mozambique to provide a two-kilogram sample of heroin for delivery to the United States, later described during in-person meetings in Kenya with an undercover agent and confidential source how he was a leader in a drug trafficking organization that had distributed drugs around the globe for years, and discussed providing 500-kilogram loads and as much as two or three tons that year); *United States v. Campo Flores & Flores de Freitas*, S2 15 Cr. 765 (PAC), Dkt. 191-92 (imposing 216-month sentences upon two nephews of Venezuela's first lady, who devised a plan to work with the FARC members to import over 800 kilograms of cocaine from Venezuela to the United States); *United States v. Khan*, 16 Cr. 840 (LGS) (imposing 180-month sentence where 71-year-old defendant, a native of Pakistan, agreed to transport tens of thousands of kilograms of heroin to New York City and provided a five-kilogram sample of heroin); *United States v. Younes and Gomez*, 18 Cr. 262 (VEC) (imposing 120-month sentences where 74- and 76-year-old defendants, natives of Colombia, brokered and provided a five-kilogram sample of cocaine and conspired to transport many tons more).

and claim access to corrupt Bolivian air-traffic officials. In contrast, the defendant was, in fact, a senior Bolivian government official, used his position to further the conspiracy, and oversaw every aspect of the conspiracy as its senior leader. There is no meaningful comparison between the defendant's conduct and that of Robledo-Anez.

## II.    The Defendant's Sentencing Arguments are Unpersuasive

The defendant's sentencing submission requests a sentence of 120 months' imprisonment—the mandatory minimum applicable sentence. The defendant's request for such extraordinary leniency should be rejected.

*First*, the defendant's argument that his purported role in the offense warrants leniency is an abject rejection of responsibility. Indeed, he claims that his only role in the offense—of which he was convicted at trial—"was to be caught up in the DEA's push to interdict shipments of cocaine as they passed through Cartagena, Colombia." (Def. Mem. at 5). This is a mischaracterization of the proof in this case and the defendant's involvement in the offense conduct. At bottom, the defendant's argument that he had no role in the offense whatsoever is wholly contradicted by the evidence at trial and by the jury's verdict.

*Second*, the defendant's history and characteristics do not warrant the mandatory minimum sentence he seeks. As stated above, it is no wonder that the director of Bolivia's chief anti-narcotics trafficking agency—who abused his power to facilitate the very drug trafficking he was supposed to investigate—has never before "been on the wrong side of the handcuffs." (Def. Mem. at 5). That is by design.

*Third*, the defendant states, without explanation, that his status as a law enforcement officer from another country makes him vulnerable while incarcerated, and thus, a downward variance is warranted. (Def. Mem. at 7). The defendant's blatant abuse of his status as a law enforcement officer is an aggravating factor supporting a Guidelines sentence, not a mitigating one supporting the mandatory minimum. Moreover, the defendant has been incarcerated in the United States while being a former law enforcement officer since December 12, 2024, and the Government has not been made aware of any safety issues concerning the defendant.

*Fourth*, and as noted above, the defendant's arguments that he is less culpable than Carlos Robledo Anez and thus deserves the mandatory minimum sentence to avoid unwarranted sentencing disparities, are both factually incorrect and unpersuasive. Robledo Anez participated in a conspiracy to import 1,700 kilograms of cocaine into the United States, planned to use his purported contacts within Bolivia's airspace control agencies to facilitate that shipment, and invested $5,000 to aid in the shipment of a 10-kilogram sample of cocaine to the United States. (*See* Dkt. 556, 563). Unlike the defendant, Robledo Anez was not himself a government official—must less the highest government official in the country responsible for stopping drug trafficking—he did not command a para-military police force armed with machineguns, his offense did not involve firearms at all, he pleaded guilty and timely accepted responsibility, he met the criteria for Safety Valve eligibility, he did not attend proffer sessions with the Government he later claimed were filled with lies, and he not commit perjury. (*See* Dkt. 556). Robledo Anez's Guidelines range was 135 to 168 months' imprisonment; because of the Safety Valve, Robledo Anez faced

no mandatory minimum sentence; and this Court sentenced him to 72 months' imprisonment. (*Id.*). And yet, the defendant stunningly claims that Robledo Anez "was without question above Mr. Davila-Perez in the hierarchy of this enterprise." (Def. Mem. at 9). The defendant appears to reach this conclusion because (1) Robledo Anez agreed to import more cocaine than did the defendant (both of whom conspired to import well over a metric ton); and (2) "the Government's largess in his plea agreement" resulted in no points for Robledo Anez's acting as a leader, supervisor, organizer or manager, which, according to the defendant, "he clearly was." (Def. Mem. at 9). The defendant cites no basis for this claim, nor is there any. Robledo Anez's 72-month sentence is not comparable with the defendant's Guidelines range of life, and the defendant provides no reason why Robledo Anez's sentence somehow warrants the mandatory minimum sentence to be imposed on the defendant.

*Fifth*, the defendant claims that he is eligible for a zero-point offender reduction pursuant to U.S.S.G. § 4C1.1. He is not. As noted above, the defendant both induced members of the conspiracy to possess firearms in connection with the offense, (*see* § 4C1.1(a)(7)), and will receive an aggravating role adjustment under § 3B1.1, (*see* § 4C1.1(a)(10)).[13] (*See* PSR ¶ 73 (no zero-point offender reduction due to aggravating role adjustment)).

*Sixth*, that the defendant was extradited to the United States and expects his social visits in prison to be "non-existent" is not a basis for the striking variance he seeks. (Def. Mem. at 11). The defendant is one of many who are extradited to face trial for crimes committed against the United States, and indeed, finds himself in the same circumstances as each of his co-defendants.

*Seventh*, the defendant's argument that his sentence should be reduced because his offense conduct makes him ineligible for certain relief under the First-Step Act must be rejected; his own conduct disqualifies him, and that should not support a variance under the Guidelines. To the extent the defendant fails to qualify for early release or other jail credits because of the nature of his offense, he should not receive a variance that would have the effect of bringing the defendant's sentence in-line with the offenders for whom relief under the First-Step Act was actually contemplated.

*Eighth*, the defendant takes issue with certain Guidelines enhancements, though correctly acknowledges that the provisions he identifies are not deemed "double counting" under the law. (Def. Mem. at 12). That the defendant both acted as a leader and abused his position of public trust is not the mitigation the defendant thinks it is.

*Ninth*, the defendant attempts to compare his case to that of the defendant in *United States v. Jey James Roldan Cardenas*, 2026 WL 452027 (2d Cir. 2026), but the facts of *Roldan* chiefly highlight the defendant's own culpability. Among other things, unlike the defendant in *Roldan*,

---

[13] The defendant seemingly agrees that his role with respect to firearms made him ineligible for the zero-point offender reduction, but argues that his involvement with firearms was minimal because he was not alleged to have been personally carrying weapons. (Def. Mem. at 12). The Government respectfully submits that the defendant's role as the leader of a large paramilitary organization using machine guns and destructive devices deeply aggravates his conduct with respect to weapons when compared with the average gun-carrying defendant.

who was posing as high-ranking police officer but was, in fact, a patrolman, the defendant was the chief law enforcement officer for counter-narcotics activity of the entire Bolivian nation. He was, therefore, perfectly positioned to deliver on the promises he was making to the co-conspirators. Moreover, his senior position makes his story of personally and independently conducting an undercover operation to ensnare drug traffickers unbelievable. In any event, the defendant testified in his own defense and was not prevented from introducing any evidence as the Second Circuit ruled the defendant was in *Roldan*. The jury did not credit the defendant's testimony, and his case is thus factually and legally distinct from *Roldan*.

*Finally*, the defendant's spurious claims about the conditions of confinement at the Essex County Correctional Facility ("ECCF") likewise do not warrant the mandatory minimum sentence. It is unclear how the defendant suggests his claims about ECCF are substantiated, but the Government has confirmed that they are categorically false. For example, the defendant claims he was locked into his cell 23.5 hours a day and provided no recreation or outdoor time. However, in the two weeks preceding this submission, ECCF as a whole experienced lockdown conditions on only four (out of 20) shifts, and not once for any full 24-hour period. Other than those shifts, an official from ECCF has confirmed that "the inmates have had access to go outside, shower, watch TV, play cards or board games, make phone calls and video visits, use their tablets, do laundry and utilize the law library." The defendant simply cannot support the weight of the argument concerning the conditions of his confinement.

* * *

The Section 3553(a) factors thus weigh heavily in favor of a Guidelines sentence, and nothing in the defendant's sentencing submission casts doubt on the propriety of such a sentence in this case.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should impose a Guidelines sentence of life imprisonment.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: /s/ _____
　　Matthew J.C. Hellman
　　David J. Robles
　　Chelsea L. Scism
　　Assistant United States Attorneys
　　(212) 637-2278 / 2550 / -2105

cc:　　Defense Counsel (by ECF)